**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MARK A. SHANK, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. |
| v. | **CLASS ACTION COMPLAINT** **DEMAND FOR JURY TRIAL** |
| HEALTH CARE SERVICE CORPORATION, BLUECROSS BLUESHIELD OF ILLINOIS, and PRIME THERAPEUTICS LLC | |
| Defendants. | |

**GLOSSARY OF DEFINED TERMS AND
EXHIBITS ATTACHED TO PLAINTIFF'S COMPLAINT**

**Exhibits**

Exhibit A:                  Plaintiff Mark A. Shank's HCSC Policy (Redacted to remove Plaintiff's personal identification information).

Exhibit B:                  Defendants' Coverage Guidelines for Harvoni.

Exhibit C:                  Plaintiff's Progress Note signed by Dr. Davendra Ramkumar on November 17, 2015 (Redacted to remove Plaintiff's personal identification and medical information).

Exhibit D:                  Prime Therapeutics LLC's Prior Authorization Form for Harvoni.

Exhibit E:                  BlueCross BlueShield Illinois December 7, 2015 Harvoni coverage denial letter (Redacted to remove Plaintiff's personal identification information).

Exhibit F:                  Plaintiff's January 14, 2016 appeal of denial of Harvoni coverage (Redacted to remove Plaintiff's personal identification information).

Exhibit G:                  BlueCross BlueShield Illinois February 6, 2016 Viekira Pak coverage denial letter (Redacted to remove Plaintiff's personal identification information).

**Defined Terms in Plaintiff's Complaint**

AASLD:                  American Association for the Study of Liver Diseases

AMA:                    American Medical Association

CFA:                    Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.*

CHC:                    Chronic Hepatitis C

CHC Guidelines:         Guidelines established for the testing, management, and treatment of CHC by the American Association for the Study of Liver Diseases and Infectious Diseases Society of America.

Coverage Guidelines:    HCSC's internal criteria for determining which CHC sufferers will be denied coverage for Harvoni treatment.  *See* Exhibit B.

Covered Drug:           Any legend drug:

i

(i) Which is Medically Necessary and is ordered by a Health Care Practitioner naming you as the recipient;

(ii) For which a written or verbal Prescription Order is provided by a Health Care Practitioner;

(iii) For which a separate charge is customarily made;

(iv) Which is not entirely consumed or administered at the time and place that the Prescription Order is written;

(v) For which the FDA has given approval for at least one indication; and

(vi) Which is dispensed by a Pharmacy and is received by you while covered under this Benefit Section, except when received from a Provider's office, or during confinement while a patient in a Hospital or other acute care institution or facility (refer to the EXCLUSIONS provision later in this Benefit Section). Exhibit A at Page 111-112.

Covered Services:     Benefits for Medically Necessary Covered Drugs prescribed to treat you for a chronic, disabling, or life-threatening illness are available if the drug: 1. Has been approved by the FDA for at least one indication; and 2. Is recognized in substantially accepted peer-reviewed medical literature for treatment of the indication for which the drug is prescribed. Exhibit A at Page 115.

DAA:     Direct-Acting Antiviral

FDA:     United States Food and Drug Administration

Finance Committee Report:     STAFF OF S. COMM. ON FINANCE, 114TH CONG., THE PRICE OF SOVALDI AND ITS IMPACT ON THE U.S. HEALTH CARE SYSTEM (Comm. Print 2015), http://www.finance.senate.gov/imo/media/doc/1%20The%20Price%20of%20Sovaldi%20and%20Its%20Impact%20on%20the%20U.S.%20Health%20Care%20System%20(Full%20Report).pdf (detailing the history behind the treatment of CHC)

Gilead:     Gilead Sciences, Inc.   The company that distributes Harvoni.

IDSA:                          Infectious Diseases Society of America

IOM:                           Institute of Medicine

Medically Necessary:           Medically Necessary means that a specific medical, health care or Hospital service is required, in the reasonable medical judgment of Blue Cross and Blue Shield, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided.

                               In making decisions of whether the hospitalization or other health care service(s) or supply(ies) are not Medically Necessary, and therefore not eligible for payment under the terms of your Policy, Blue Cross and Blue Shield *will apply generally accepted medical standards and will take into account the information submitted to Blue Cross and Blue Shield by the covered person's Provider(s),* including any consultations with such Provider(s). Exhibit A at Page 125 (emphasis added).

METAVIR Score:                 METAVIR fibrosis score that classifies liver scarring from F0-F4.

PBM:                           Pharmacy Benefits Manager

Pharmasset:                    Pharmasset, Inc.   The company that carried out the initial development and FDA approval of Harvoni.

Shank Policy:                  Plaintiff Mark A. Shank's HCSC Policy administered by BlueCross BlueShield Illinois—Policy Number 921095275. *See* Exhibit A at Page 5.

SVR:                           Sustained Virologic Response

UDTPA:                         Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*

HCSC Policies:                 Health insurance programs, contracts, plans, and/or policies marketed and/or sold by HCSC.

iii

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ............................................................................................................ 8

III.    JURISDICTION AND VENUE ........................................................................ 10

IV.     FACTUAL ALLEGATIONS ............................................................................ 10

    A.      Chronic Hepatitis C ("CHC") ............................................................. 10

    B.      Harvoni .................................................................................................. 13

    C.      Early Treatment of CHC Is the Standard of Care in the Medical Community ..... 14

    D.      Harvoni Is Medically Necessary under the Terms of Plaintiff's and Class Members' HCSC Policies ...................................................... 15

    E.      All Defendants Apply the Same Coverage Guidelines to Arbitrarily Deny Coverage for Harvoni Treatment ........................................ 19

    F.      Defendants Unlawfully Deny Coverage for Harvoni Treatment .......................... 19

    G.      Class Representative Allegations ........................................................ 20

V.      CLASS ACTION ALLEGATIONS ................................................................. 23

VI.     CLAIMS ........................................................................................................... 26

VII.    PRAYER FOR RELIEF ................................................................................... 32

VIII.   DEMAND FOR JURY TRIAL ........................................................................ 33

Plaintiff Mark A. Shank ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Defendants Health Care Service Corporation ("HCSC"), BlueCross BlueShield of Illinois ("BCBSIL") and Prime Therapeutics LLC (collectively, "Defendants") based upon information and belief[1] except as to the allegations pertaining specifically as to Plaintiff that are based on personal knowledge.

## I.      INTRODUCTION

1.      Plaintiff brings this class action lawsuit individually and on behalf of similarly situated Class members (defined below) against Defendants for their refusal to pay for Harvoni—a medically necessary treatment that can *effectively cure* Plaintiff's and Class members' chronic Hepatitis C ("CHC").  Defendants wrongfully denied coverage for Harvoni based on a desire to decrease costs and increase profits, in breach of the health insurance contracts Defendants entered into with Plaintiff and Class members and in violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (the "UDTPA") and Consumer Fraud Act, 815 ILCS 505/1 *et seq.* (the "CFA").

2.      Through its divisions and subsidiaries, HCSC markets and sells health insurance programs, contracts, plans, and/or policies (the "HCSC Policies") to millions of people in Illinois, Montana, New Mexico, Oklahoma and Texas.  *See, e.g.*, Exhibit A.  Plaintiff and Class members purchased the HCSC Policies, entered into binding contracts with one or more Defendants, paid insurance premiums, and relied on Defendants to provide health insurance and prescription drug coverage under the terms set forth in the HCSC Policies and in good faith.

---

[1] Plaintiff's information and belief is based on an investigation (by and through counsel) which included, among other things, a review and analysis of publicly available information, news articles, reports to federal regulators, and additional analysis. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      HCSC's divisions and subsidiaries—BCBSIL, BlueCross BlueShield of Montana, BlueCross BlueShield of New Mexico, BlueCross BlueShield of Oklahoma, and BlueCross BlueShield of Texas—administer Plaintiff's and Class members' HCSC Policies.   Prime Therapeutics LLC ("Prime") serves as the pharmacy benefits manager ("PBM") for the HCSC Policies.   *See, e.g.*, Exhibit A at Page 9.   Defendants were required to exercise good faith and deal fairly with Plaintiff and Class members when making coverage decisions and/or administering the HCSC Policies.

4.      The HCSC Policies are substantially similar in all material respects, are the complete agreement between Defendants and Plaintiff and Class members, and contain materially identical definitions of "Medically Necessary" or definitions with immaterial differences with respect to the claims herein.   Defendants' obligations to Plaintiff and the Class are identical.   Plaintiff and Class members reasonably relied—as Defendants intended—on Defendants' express and implied representations in the HCSC Policies that they would provide health insurance and prescription drug coverage for Medically Necessary treatments, and not unreasonably deny coverage in bad faith.

5.      Plaintiff and Class members suffer from CHC, and Harvoni is a Medically Necessary Covered Drug for Plaintiff and Class members under the HCSC Policies.   Plaintiff and Class members were prescribed Harvoni by their physicians to treat their CHC but were wrongfully denied coverage by Defendants.   Rather than pay for the cost of Harvoni—a once daily tablet that can effectively cure CHC in eight to twelve weeks with minimal side effects—Defendants uniformly applied internal clinical guidelines (the "Coverage Guidelines") to wrongfully deny Harvoni coverage in breach of the implied and express contractual obligations

owed to Plaintiff and Class members and in breach of applicable state law, including the UDTPA and CFA.  *See* Exhibit B (setting forth Defendants' Coverage Guidelines for Harvoni).[2]

6.     Insurance companies' practices have drawn the attention of state regulators as the New York State Attorney General is investigating several insurers and issued subpoenas demanding information about their policies for covering Harvoni.  According to a March 2, 2016 report in *The Wall Street Journal*, "[t]he [Attorney General's Harvoni] inquiry centers on whether the firms are engaging in ***misleading and deceptive practices***, because the law requires accurate disclosure of what they cover and consider medically necessary. . . ."[3]

7.     Hepatitis C is a contagious blood-borne virus that attacks the liver and affects millions of people in the United States.[4]  There is an acute form and a chronic form of Hepatitis C; CHC leads to an increase in mortality.[5]  Approximately 75% to 85% of people who are infected with Hepatitis C are chronic carriers, and, until recent scientific breakthroughs, required extensive treatment of the chronic illness.[6]  There are seven separate genotypes of the CHC virus; genotypes 1, 2, and 3 are the most prevalent in the United States.[7]

---

[2] *Hepatitis C Second Generation Antivirals Harvoni, Viekira, Technivie Prior Authorization – Through Preferred Agents Program Summary*, available at https://www.myprime.com/content/dam/prime/memberportal/forms/AuthorForms/HCSC/HCSC_CS_HepC_SecGen_PA_ProgSum.pdf  (last visited 3/30/16).

[3] Corinne Ramey, *Insurers Probed on Hepatitis C Drug Coverage*, THE WALL STREET JOURNAL (Mar. 2, 2016) (emphasis added), http://www.wsj.com/articles/insurers-probed-on-hepatitis-c-drug-coverage-1456965087.

[4] Eric Chak, *et al.*, *Hepatitis C Virus Infection in USA: An Estimate of True Prevalence,* 31 LIVER INT'L 1090, 1090-1101 (Sept. 2011), http://onlinelibrary.wiley.com/doi/10.1111/j.1478-3231.2011.02494.x/epdf.

[5] Stephen L. Chen and Timothy R. Morgan, *The Natural History of Hepatitis C Virus (HCV) Infection*, INT J MED SCI 2006, 47-52, http://www.medsci.org/v03p0047.htm.

[6] *See id.*

[7] Donald G. Murphy, *et al.*, *Hepatitis C Virus Genotype 7, a New Genotype Originating from Central Africa,* 53 J. CLINICAL MICROBIOLOGY 967, 967–72 (Mar. 2015), http://www.ncbi.nlm.nih.gov/pubmed/25520447.

3

8.      CHC can lead to a host of medical problems that shorten life expectancy.[8]  For example, CHC patients are at an increased risk of developing advanced scarring of the liver—cirrhosis—which causes reduced liver function and is a life-threatening condition.[9]  CHC patients are also at an increased risk of developing liver cancer, which has one of the highest mortality rates of any cancer.[10]  Prior to experiencing irreversible liver damage, CHC sufferers may experience, among other things, a high risk of heart attack, fatigue, depression, arthritis, fever, itchy skin and jaundice.[11]

9.      Before recent drug developments, individuals with CHC often underwent extensive treatment regimens lasting twenty-four or forty-eight weeks and consisting of daily pills and a weekly injection of a drug known as Interferon.[12]  Interferon causes debilitating side effects; the worst of which can be flu-like symptoms lasting throughout the twenty-four or forty-eight week treatment-regimens.[13]  Interferon-treated CHC patients suffer the drug's side effects without any assurance that their Hepatitis C will be cured.[14]  Interferon as a standalone drug has a poor SVR rate and, even in combination with antiviral drugs, the SVR rate is less than 50%.[15]

---

[8] *See* Chen and Morgan, *supra* at n.5.

[9] *See id.*

[10] *See id.*

[11] *See id.*

[12] *See* STAFF OF S. COMM. ON FINANCE, 114TH CONG., THE PRICE OF SOVALDI AND ITS IMPACT ON THE U.S. HEALTH CARE SYSTEM (Comm. Print 2015), 8, http://www.finance.senate.gov/imo/media/doc/1%20The%20Price%20of%20Sovaldi%20and%20Its%20Impact%20on%20the%20U.S.%20Health%20Care%20System%20(Full%20Report).pdf (detailing the history behind the treatment of CHC) (hereinafter "Finance Committee Report").

[13] *See id.*

[14] *See id.*  A patient is considered cured of Hepatitis C when a blood test is incapable of detecting the virus twelve or twenty-four weeks after treatment (depending on the treatment) based on the patient's sustained virologic response ("SVR") rate.

[15] *See id.*

10.     Within the last five years, pharmaceutical companies have developed direct-acting antiviral ("DAA") drugs for the treatment of CHC that significantly shorten the length of treatment, significantly reduce the side effects, and significantly increase the SVR rate.[16]  These new DAA drugs do not require the use of Interferon to treat CHC, meaning that patients on DAA drugs do not have to suffer debilitating side effects.[17]  Most importantly, the new DAA drugs are capable of *curing* CHC after only an eight to twelve week regimen of a once daily tablet.  One of these new DAA drugs, Harvoni (ledipasvir-sofosbuvir), developed and distributed by Gilead Sciences, Inc. ("Gilead"), is at the heart of this class action lawsuit.

11.     The United States Food and Drug Administration (the "FDA") approved Harvoni exclusively for the treatment of genotype 1 CHC patients in October of 2014, calling it a "breakthrough" drug.[18]  Harvoni is the first drug approved for the treatment of CHC that does not require combination with other drugs, and can *effectively cure CHC in 94% to 100% of cases* with little to no side effects.[19]

12.     Notwithstanding the life-saving treatment offered by Harvoni, Defendants have limited the Class's access to this miracle drug by developing arbitrary coverage criteria requiring advanced liver scarring for CHC sufferers.  *See* Exhibit B.  Liver scarring severity is classified by the METAVIR fibrosis score ("METAVIR Score"), which is measured on a scale of F0 to F4.[20]  METAVIR Scores between F0 and F2 represent no liver scarring to light liver scarring whereas METAVIR Scores between F3 and F4 represent severe liver scarring, with F4

---

[16] *See id.*

[17] *See id.*

[18] *See id.*

[19] Shara Yurkiewicz, *Harvoni Safe and Effective for Cirrhotic Patients*, MEDPAGE TODAY, May 18, 2015, http://www.medpagetoday.com/MeetingCoverage/DDW/51605?xid=nl_mpt_DHE_2015-05-19&eun=g605133d0r (summarizing a study that demonstrated the effective cure rate of Harvoni).

[20] Thierry Poynard, *et al.*, *Fibrosis in Patients with Hepatitis C: Detection and Significance: Detection and Significance*, SEMINARS IN LIVER DISEASE, 2000, http://www.medscape.com/viewarticle/410846_2.

representing cirrhosis.[21]  Defendants' Coverage Guidelines cover Harvoni treatment only for patients who have a METAVIR Score of F2 or higher, or its equivalent.  *See* Exhibit B at 2. (detailing Defendants' Coverage Guidelines for covering the payment of Harvoni).  Advanced fibrosis and cirrhosis can progress to end-stage liver disease and liver failure.[22]

13.    The Coverage Guidelines are not a part of the HCSC Policies and are not in accordance with standard medical practice.  Defendants have unlawfully applied the Coverage Guidelines to arbitrarily refuse Harvoni coverage for CHC patients who do not have a METAVIR Score of F2 or higher, or its equivalent,[23] in breach of the HCSC Policies and in violation of state law, including the UDTPA and CFA.

14.    Defendants' Coverage Guidelines also deviate from the standard of care in the medical community for the treatment of CHC.  Since the development of new DAA drugs to treat CHC, such as Harvoni, the standard of care in the medical community has been to treat CHC as soon as the disease is diagnosed so that patients do not suffer the life-threatening complications associated with fibrosis and cirrhosis.  Accordingly, as early as January 2014, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") have jointly recommended that *all* CHC patients be treated with DAA therapies, regardless of disease progression.  These recommendations were made in guidelines established for the testing, management, and treatment of CHC ("CHC Guidelines").[24] The CHC Guidelines expressly state that: "[t]reatment is recommended for *all* patients with

---

[21] *See id.*

[22] *See Cirrhosis*, PUBMED HEALTH, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0022024/.

[23] Defendants' METAVIR Score requirement is the major determining factor of whether a patient will receive coverage for Harvoni treatment.  While there are other tests that classify liver scarring, the METAVIR Score is the most common.

[24] *See* AASLD and IDSA, *When and In Whom to Initiate HCV Therapy, Recommendations for Testing, Managing, and Treating Hepatitis C*, http://www.hcvguidelines.org/printpdf/91.

chronic HCV infection, except those with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy."[25]

15. Plaintiff and Class members were diagnosed with CHC, prescribed Harvoni by their physicians, and unlawfully denied coverage. As a result, Plaintiff and Class members have been and continue to be irreparably damaged by Defendants' unlawful denial of coverage for Medically Necessary Harvoni treatment.

16. At the time Defendants created the Coverage Guidelines and denied Plaintiff and Class members Harvoni coverage, Defendants knew or should have known that the standard of care for the treatment of CHC was treating the illness as soon as the patient was diagnosed and prescribed Harvoni by a licensed physician.[26] Defendants' uniform practice of denying coverage for Harvoni treatment for CHC sufferers without a METAVIR score of F2 or higher, or alternative scoring equivalent, is and was a deceptive trade practice in the course of conduct involving trade or commerce under the UDTPA. Further, Defendants are and were aware that their practice of denying Harvoni treatment based on the Coverage Guidelines creates a likelihood of confusion or misunderstanding in light of the terms of the HSCS Policies, including *inter alia*, the definition of Medically Necessary and intended for Plaintiff and Class members to rely on their deceptive trade practice.

17. As a proximate result of this deceptive trade practice, Plaintiff and Class members have been and continue to be damaged by Defendants' artificial restriction of coverage for treatment with Harvoni.

---

[25] *AASLD and IDSA, When and In Whom to Initiate HCV Therapy, Recommendations for When and in Whom to Initiate Treatment,* http://www.hcvguidelines.org/full-report/when-and-whom-initiate-hcv-therapy (emphasis added).

[26] *See id.* ("Treatment is recommended for all patients with chronic HCV infection, except those with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy.").

18. Further, Defendants' wrongful denial of Harvoni coverage constitutes an unfair act or practice in violation of the CFA because it offends public policy, is immoral, unethical, oppressive, or unscrupulous and/or causes substantial injury to consumers. *See* 815 ILCS 505/2.

19. Defendants' wrongful denial of Harvoni coverage also constitutes a "deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" with the intention that Plaintiff and Class members rely thereon in connection with Defendants' sale of the HCSC Policies and/or provision of health insurance and prescription drug coverage services in violation of the CFA. *See* 815 ILCS 505/2.

20. As a result of Defendants' unlawful denial of Harvoni coverage in breach of the HCSC Policies and Defendants' duty of good faith and fair dealing, and in violation of the UDTPA and CFA, Plaintiff and Class members are entitled to actual damages in the amount of the retail cost of Harvoni and damages to be determined at trial and/or injunctive relief under the UDTPA and CFA.

## II. PARTIES

21. Plaintiff Mark A. Shank is and was, at all relevant times, a citizen of the State of Illinois residing in Champaign, Illinois. On January 1, 2015, Plaintiff purchased an HCSC Policy through BCBSIL on the individual market, which was renewed on January 1, 2016. *See* Exhibit A at Page 5.

22. Plaintiff was prescribed Harvoni by his treating physician and denied coverage by Defendants.

23. Plaintiff's HCSC Policy was in force at the time coverage for his physician-prescribed treatment with Harvoni was denied by Defendants.

24. Defendant Health Care Service Corporation ("HCSC") is an Illinois corporation headquartered at 300 E. Randolph Street, Chicago, Illinois. HCSC is the fourth largest health

insurance company in the United States and is an independent licensee of the Blue Cross Blue Shield Association. HCSC markets itself as a Blues plan and its health insurance divisions and/or subsidiaries include: BCBSIL, BlueCross BlueShield of Montana, BlueCross BlueShield of New Mexico, BlueCross BlueShield of Oklahoma, and BlueCross BlueShield of Texas. HCSC has more than 15 million members and began a three-year billion-dollar profit streak in 2010.[27]

25. Defendant BlueCross BlueShield of Illinois ("BCBSIL") is a Division of HCSC and is headquartered at 300 E. Randolph Street, Chicago, Illinois. BCBSIL provides more than 8.1 million members with health insurance in Illinois and administers Plaintiff's HCSC Policy.

26. Defendant Prime Therapeutics LLC ("Prime") is a Delaware corporation with its principal place of business located at 1305 Corporate Center Drive, Eagan, Minnesota. Prime is owned by thirteen Blue Cross and Blue Shield health plans, subsidiaries or affiliates of those plans, including BCBSIL. Prime is registered to conduct business in Illinois and its registered agent is located at 801 Adlai Stevenson Dr., Springfield, IL.

27. Prime acts as an agent on behalf of HCSC in its role as PBM under the HCSC Policies. HCSC has the ability to control and exercises control over Prime, and Prime assents to HCSC's control. HSCS directs Prime to apply the Coverage Guidelines to deny Harvoni Coverage for CHC sufferers without a METAVIR Score of F2 or higher, or its equivalent, and Prime relied on the Coverage Guidelines to deny prescription drug coverage for Harvoni for Plaintiff and Class members. Prime acts as the PBM under Plaintiff's policy with BCBSIL. *See* Exhibit A at Page 9, 13.

---

[27] Andrew L. Wang, *Blue Cross Parent Boosts Profit in Second Quarter*, CRAIN'S CHICAGO BUSINESS (Sept. 3, 2013), http://www.chicagobusiness.com/article/20130903/NEWS03/130909990/blue-cross-parent-boosts-profit-in-second-quarter.

III.     **JURISDICTION AND VENUE**

28.     This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of a proposed class in excess of 100 members, the aggregate claims of the Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the Class is a citizen of a different state than one or more Defendants.

29.     This Court has personal jurisdiction over HCSC because HCSC's principal place of business is in the State of Illinois and it regularly conducts business in the State of Illinois, has sufficient minimum contacts with Illinois, and avails itself of the laws of Illinois.

30.     This Court has personal jurisdiction over BCBSIL because BCBSIL's principal place of business is in the State of Illinois and it regularly conducts business in the State of Illinois, has sufficient minimum contacts with Illinois, and much of the relevant conduct occurred in Illinois.

31.     This Court has personal jurisdiction over Prime because it is registered to conduct business in the State of Illinois, regularly conducts business in the State of Illinois, has sufficient minimum contacts with Illinois, and much of the relevant conduct occurred in Illinois.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the unlawful conduct alleged in this Complaint occurred in, was directed to, and/or emanated from this District, and because HCSC and BCBSIL maintain their principal places of business in this District.

IV.     **FACTUAL ALLEGATIONS**

A.     **Chronic Hepatitis C ("CHC")**

33.     The Hepatitis C virus is small virus that is enveloped in Ribonucleic acid ("RNA").  The genetic sequence of the virus was first discovered in 1989.  The Hepatitis C virus

has a highly variable genome and is classified into multiple genotypes and sub-genotypes. There are seven different genotypes of the Hepatitis C virus and each genotype has its own sub-genotypes. There is no single drug that can treat the full spectrum of Hepatitis C virus genotypes and sub-genotypes. Instead, the FDA has approved drug regimens for specific Hepatitis C genotypes and sub-genotypes.

34.     As described above, CHC can lead to a host of medical problems, including increased mortality. About 70% of CHC cases in the United States are of genotype 1, and the majority of these cases are of sub-genotypes 1a and 1b. It is estimated that genotypes 2 and 3 account for 16% and 12% of cases in the United States, respectively. Genotypes 4, 5 and 6 account for fewer than 4% of cases in the United States.[28]  Genotype 1 is the most difficult to treat.

35.     CHC results in inflammation, scarring, and cirrhosis of the liver and increases the risk of liver cancer.[29]  If left untreated, CHC can cause serious illnesses, including cirrhosis, which can only be alleviated through a liver transplant.[30]  Approximately 20% of CHC carriers develop cirrhosis, and of those with cirrhosis, up to 20% develop liver cancer.[31]  Cirrhosis is extensive scarring of the liver that degrades liver function and is a life-threatening condition. CHC patients can suffer other health issues including a higher risk of heart attack, fatigue, joint

---

[28] *See, e.g.*, Jane P. Messina *et al.*, *Global Distribution and Prevalence of Hepatitis C Virus Genotypes,* 61 Hepatology 77, 77–87 (2015); M. Michele Manos et al., *Distribution of Hepatitis C Virus Genotypes in a Diverse U.S. Integrated Health Care Population,* 84 J. MED. VIROLOGY 1744, 1744–1750 (2012), http://www.ncbi .nlm.nih.gov/pubmed/22997077.

[29] Liver cancer has one of the highest mortality rates of any cancer. The relative 5-year survival rate from liver cancer is about 15%.  *See Learn About Cancer, Liver Cancer*, AMERICAN CANCER SOCIETY, http://www.cancer.org/acs/groups/cid/documents/webcontent/003114-pdf.pdf.

[30] *See* Finance Committee Report, *supra* n.12, at 7.

[31] *See id.*

pain, depression, sore muscles, arthritis, and jaundice.[32]  CHC is the leading cause of liver transplants in the United States.[33]

36.     No vaccines have been developed to prevent CHC infection.  Infection prevention and treatment are the sole options for dealing with CHC.  The goal of CHC treatment is to reduce the patient's viral load.  Thus, the effectiveness of any Hepatitis C drug is measured by the reduction in the viral count.  A patient is considered cured of CHC when a blood test, twelve or twenty-four weeks after treatment, is incapable of detecting the virus.  Being cured is referred to as showing an SVR.

37.     Since the discovery of the existence of CHC, Interferon has been the primary treatment option.  Interferon is a naturally occurring protein that cells secrete when they are attacked by a virus.  Treatment with Interferon has many drawbacks; Interferon treatment requires injections and causes side effects, including flu-like symptoms such as fever, fatigue, muscle aches, and myalgia.  Many patients report suffering flu-like symptoms during the entire course of Interferon treatment, which can last up to a year.  The SVR (or cure) rate for Interferon is low—6% for twenty-four week and 16% forty-eight week regimens.

38.     In 1998, the FDA approved the use of Ribavirin, an anti-viral drug, for use in combination with Interferon to treat CHC.  The Interferon and Ribavirin combination improved the SVR rate for patients but continued to leave millions of patients uncured.  The SVR (or cure) rate for the Interferon and Ribavirin combination treatment is 34% for twenty-four week and 42% for forty-eight week regimens.

39.     After the development of Ribavirin, the next advance was the development of DAA drugs, which work by attacking specific viral proteins within the Hepatitis C virus's RNA.

---

[32] *See* Chen and Morgan, *supra* n.5.

[33] *See id.*

In 2011, the FDA approved two DAAs, boceprevir (brand name Victrelis) and telaprevir (brand name Incivek). In 2013, the FDA approved two additional DAA's, simprevir (brand name Olysio) and Sovaldi. The new DAA drugs represented the first time that Hepatitis C patients could be treated with drugs that did not require use of Interferon and the corresponding negative side effects.

40. The FDA approved the use of Sovaldi without the use of Interferon for the treatment of genotype 2 and genotype 3 CHC patients. The larger group of CHC sufferers—genotype 1 CHC patients—still required the use of Interferon and ribavirin with Sovaldi. However, in October 2014, the FDA approved Harvoni—the first genotype 1 CHC treatment that did not require the use of Interferon.

**B. Harvoni**

41. Gilead, a Delaware company headquartered in Foster City, California, is a biopharmaceutical company that discovers, develops, and commercializes drugs in areas of unmet medical need. Gilead introduced Sovaldi and Harvoni to the market as effective cures for CHC.

42. Gilead acquired Sovaldi and Harvoni when it purchased Pharmasset, Inc. ("Pharmasset"), a pharmaceutical company based out of Princeton, New Jersey. Pharmasset carried out the initial developments of the drugs and the process of FDA approval. Before Pharmasset could bring the drugs to the market, Gilead acquired Pharmasset in January 2012.

43. The FDA granted breakthrough therapy designation to Sovaldi on October 10, 2013.[34] Approximately two months later, on December 6, 2013, the FDA approved Sovaldi as a

---

[34] FDA breakthrough therapy designation speeds up the process for a drug to be introduced to the market. *See Food and Drug Administration Safety and Innovation Act (DASIA), Fact Sheet: Breakthrough Therapies*, U.S. Food and Drug Administration, http://www.fda.gov/RegulatoryInformation/Legislation/SignificantAmendmentstotheFDCAct/DASIA/ucm329491.html.

component of a combination antiviral treatment regimen for the treatment of CHC patients with genotypes 1, 2, and 3.[35]  Almost a year later, on October 10, 2014, the FDA approved Harvoni for the treatment of genotype 1 CHC patients.[36]

44.  Today, for patients with genotype 1 CHC, the recommended treatment by the AASLD and IDSA is Harvoni.[37]  According to the website HCV Advocate, which compiles data from clinical studies of Harvoni, the duration of Harvoni treatment depends on the patient's viral count and whether the patient has undergone previous CHC treatment.  An eight-week regimen may be used for treatment-naïve patients without cirrhosis and with a viral count of less than 6 million per milliliter of blood.  A twelve-week regimen should be used for treatment-naïve patients with or without cirrhosis and with a viral count higher than 6 million per milliliter of blood, and for treatment-experienced patients without cirrhosis.  For treatment-experienced patients with cirrhosis, the recommended treatment duration is twenty-four weeks.  The recommended dosage is one tablet of Harvoni once daily, which contains 90 mg of ledipasvir and 400 mg of sofosbuvir.  The reported SVR rate for Harvoni is 90% or above for all treatment durations, measured twelve weeks post-treatment.

## C.   Early Treatment of CHC Is the Standard of Care in the Medical Community

45.  On January 29, 2014, the AASLD and the IDSA published the CHC Guidelines for Hepatitis C.  The CHC Guidelines, entitled "*HCV Guidance: Recommendations for Testing, Managing, and Treating Hepatitis C*," provide recommendations for the testing, management, and treatment of Hepatitis C.[38]

---

[35] *See* Finance Committee Report, *supra* n.12, at 28.

[36] *See id.* at 28.

[37] *Initial Treatment of HCV Infection*, AASLD & IDSA, http://www.hcvguidelines.org/full-report/initial-treatment-have-infection.

[38] The CHC Guidelines are available at hcvguidelines.org.

46.     Since January 2014, the AASLD and IDSA have recommended the early treatment of CHC as the standard of care—meaning treatment should begin as soon as the patient is diagnosed with CHC.  On October 22, 2015, the AASLD and IDSA updated their guidelines, stating that no impediments exist to the treatment of CHC patients who do not have advanced liver scarring, including patients who have a METAVIR Score of F0 or F1.[39]  While the AASLD and IDSA had previously prioritized CHC treatment for patients with more advanced liver scarring, that decision was based on outdated logistical impediments—the associations never took the position that the treatment of CHC patients who do not have advanced liver scarring was not medically necessary.[40]

47.     In support of the recommendation of the early treatment of Hepatitis C, the CHC Guidelines cite to studies that demonstrate that CHC patients who are treated at the early stages of their liver disease have statistically significant lower mortality rates.[41]  These studies demonstrate that patients cured of CHC at an early stage live longer and healthier lives.[42]

### D.      Harvoni Is Medically Necessary under the Terms of Plaintiff's and Class Members' HCSC Policies

48.     On information and belief, the HCSC Policies at issue are materially identical for Plaintiff and Class members and the operative terms summarized herein are included in each of the HCSC Policies sold to Plaintiff and Class members.  Pursuant to the HCSC Policies, one or

---

[39] *See* Home, *WHEN AND IN WHOM TO INITIATE HCV THERAPY*, AASLD and IDSA, http://www.hcv guidelines.org/full-report/when-and-whom-initiate-have-therapy.

[40] *See id.*

[41] *See id.* (citing, *e.g.*, Morgan, *et al.*, *Eradication of hepatitis C virus infection and the development of hepatocellular carcinoma: a meta-analysis of observational studies*, ANN INTERN MED, 2013) (documenting that among CHC sufferers, becoming virus free is associated with a more than 70% reduction in the risk of liver cancer and a 90% reduction in the risk of liver-related mortality and liver transplantation).

[42] *See id.* (citing to numerous clinical studies that show that curing CHC early leads to "dramatic reductions in all-cause mortality").

more Defendants agreed to provide payment for Medically Necessary Covered Drugs. *See* Exhibit A at Page 111-112, Page 125.

49. Treatment with Harvoni meets the definition of a Medically Necessary Covered Drug under the terms of the HCSC Policies and Defendants' refusal to cover Harvoni based on the Coverage Guidelines violates the terms of the HCSC Policies and also violates the UDTPA and CFA.

50. Under the HCSC Policies, "Covered Drugs" include any legend drug:

> (i) Which is Medically Necessary and is ordered by a Health Care Practitioner naming you as the recipient;

> (ii) For which a written or verbal Prescription Order is provided by a Health Care Practitioner;

> (iii) For which a separate charge is customarily made;

> (iv) Which is not entirely consumed or administered at the time and place that the Prescription Order is written;

> (v) For which the FDA has given approval for at least one indication; and

> (vi) Which is dispensed by a Pharmacy and is received by you while covered under this Benefit Section, except when received from a Provider's office, or during confinement while a patient in a Hospital or other acute care institution or facility (refer to the EXCLUSIONS provision later in this Benefit Section).

Exhibit A at Page 111-112.

51. The Exclusions provision contains the following definition of Medically Necessary:

> Medically Necessary means that a specific medical, health care or Hospital service is required, in the reasonable medical judgment of Blue Cross and Blue Shield, for the treatment or management of a medical symptom or condition and that the service or care provided is the most efficient and economical service which can safely be provided.

16

> In making decisions of whether the hospitalization or other health care service(s) or supply(ies) are not Medically Necessary, and therefore not eligible for payment under the terms of your Policy, Blue Cross and Blue Shield *will apply generally accepted medical standards and will take into account the information submitted to Blue Cross and Blue Shield by the covered person's Provider(s),* including any consultations with such Provider(s).

*Id.* at Page 125 (emphasis added).

52.     Under Covered Services, the HCSC Policies state that "[b]enefits for Medically Necessary Covered Drugs prescribed to treat you for a chronic, disabling, or life-threatening illness are available if the drug: 1. Has been approved by the FDA for at least one indication; and 2. Is recognized in substantially accepted peer-reviewed medical literature for treatment of the indication for which the drug is prescribed."  *Id.* at Page 115.

53.     Treatment of CHC with Harvoni for patients with a METAVIR Score of less than F2 is within generally accepted medical standards in the United States.  The American Medical Association ("AMA") defines medical necessity as:

> Health care services or products that a prudent physician would provide to a patient for the purpose of preventing, diagnosing or treating an illness, injury, disease or its symptoms in a manner that is: (a) in accordance with generally accepted standards of medical practice; (b) clinically appropriate in terms of type, frequency, extent, site, and duration; and (c) not primarily for the economic benefit of the health plans and purchasers or for the convenience of the patient, treating physician, or other health care provider.[43]

54.     The AMA further states that "[t]he 'prudent physician' standard of medical necessity ensures that physicians are able to use their expertise and exercise discretion, consistent

---

[43] *Statement of the American Medical Association to the Institute of Medicine's Committee on Determination of Essential Health Benefits,* (Jan. 14, 2011), https://iom.nationalacademies.org/~/media/8D03963CA EB2445094 7C1AEC0CAECD85.ashx.

with good medical care, in determining the medical necessity for care to be provided each individual patient."[44]

55.     The Institute of Medicine ("IOM") has stated that: "[t]he criteria used for medically necessary services or services that conform to medical necessity are medical services that are (1) clinically appropriate for the individual patient, (2) based on the best scientific evidence, taking into account the available hierarchy of medical evidence, and (3) likely to produce incremental health benefits relative to the next best alternative that justify any added cost."[45]  IOM noted that the "criteria are consistent with best practices and supported by legal precedent."[46]

56.     Defendants have no basis to deny Harvoni treatment based on a requirement of advanced fibrosis because there is no lack of supply of Harvoni and the AASLD expressly states that health insurers should not "prioritize" treatment and recognizes the "need to treat *all*" CHC patients.[47]

57.     Thus, Harvoni meets the definition of a Medically Necessary Covered Drug and a Covered Service under the HCSC Policies and, there is nothing in the HCSC Policies or within generally accepted medical standards that requires CHC sufferers' medical conditions to deteriorate to severe fibrosis or cirrhosis in order for their treatment to be considered Medically Necessary or to qualify as a Covered Drug or Covered Service.  Moreover, Defendants cannot cite to any standards of acceptable medical practice in the United States or contractual provision in the HCSC Policies that allows for artificial restrictions on treatment of CHC which require

---

[44] *Id.*

[45] John K. Iglehart, *Defining Essential Health Benefits—The View from the IOM Committee*, N. Engl. J. Med. (Oct. 20, 2011), http://www.nejm.org/doi/full/10.1056/NEJMp1109982?viewType=Print.

[46] *Id.*

[47] *AASLD Position on Treating Patients with Chronic Hepatitis C Virus*, http://www.aasld.org/aasld-position-treating-patients-chronichcv# sthash.7KlZ3Xqy.dpuf (emphasis added).

Plaintiff's and Class members' health to deteriorate to an irreversible and irreparable level before they can be treated and cured with Harvoni.

**E.      All Defendants Apply the Same Coverage Guidelines to Arbitrarily Deny Coverage for Harvoni Treatment**

58.      On information and belief, Defendants have developed, approved and uniformly applied the Coverage Guidelines that are used to make Harvoni coverage decisions across all of Defendants' entities that administer health insurance plans and/or prescription drug programs under the HCSC Policies.

59.      Despite an established standard of care for treating all CHC sufferers, the Coverage Guidelines provide the following basis for their denial of Harvoni coverage for patients without advanced fibrosis:

> Based on available resources, immediate treatment should be prioritized as necessary so that patients at high risk for liver-related complications . . . are given high priority.  As medical and financial resources are always limited, by allocating those limited resources to patients who have been shown to receive the maximum benefit, we are supporting the current recommendation and providing the highest level of impact for all patients.

Exhibit B at 1.

60.      The Coverage Guidelines cite to the IDSA and AASLD prioritization of treatment with DAAs for those patients with advanced fibrosis as a basis for the standards established in the guidelines.  *See id.*  However, as detailed herein, the IDSA and AASLD have recommended early treatment of CHC since January 2014 and never stated that the treatment of CHC patients who do not have advanced liver scarring was not medically necessary.

**F.      Defendants Unlawfully Deny Coverage for Harvoni Treatment**

61.      Harvoni is the preferred agent for the treatment of CHC under the HCSC Policies. *See* Exhibit B at 2.

62.     Defendants have applied and continue to apply the Coverage Guidelines to artificially restrict treatment of CHC patients with Harvoni to individuals with F2 stage or higher liver fibrosis and unlawfully deny coverage to all other CHC sufferers—a practice that is inconsistent with and in breach of Plaintiff's and Class members' HCSC Policies and the UDTPA and CFA.  Defendants apply these Coverage Guidelines as a cost-saving measure without regard to their contractual obligations or the health of the patient.

63.     As a matter of law, Defendants are required to make coverage decisions based on the policy language in the HCSC Policies and in good faith.  Despite the plain language of the HCSC Policies, Defendants did not apply the contract language to determine whether Harvoni prescribed by a physician was a Medically Necessary Covered Drug or Covered Service.  Rather, as alleged herein, Defendants relied upon their internal Coverage Guidelines—which are not in Plaintiff's and Class members' contracts—to arbitrarily deny the Class coverage for treatment with Harvoni.  This practice breaches the terms of the HCSC Policies and Defendants' duty of good faith and fair dealing and injures Plaintiff and Class members by denying them a potentially life-saving medication and cure for CHC.

64.     Defendants' reliance on the Coverage Guidelines to wrongfully deny coverage for Harvoni treatment also violates the UDTPA and CFA.

65.     Given Defendants' pattern and practice of uniformly applying the Coverage Guidelines to deny coverage for Harvoni treatment to all CHC sufferers without a METAVIR Score of F2 or higher, or its equivalent, any exhaustion of administrative remedies would be futile.

**G.     Class Representative Allegations**

66.     Plaintiff Mark A. Shank is currently enrolled in an HCSC Policy administered by BCBSIL—Policy Number 921095275 (the "Shank Policy")—and pays a monthly premium of

$638.46 in exchange for health insurance coverage from BCBSIL. *See* Exhibit A at Page 5. Under the Shank Policy, Mr. Shank's prescription drug program is administered by Prime. *See id.* at Page 9, Page 13.

67. The Shank Policy, consistent with all Class members' HCSC Policies, provides coverage for Medically Necessary Covered Drugs and Covered Services—the only coverage criteria disclosed to Plaintiff and Class members in the HCSC Policies. *See id.* at Page 111-112, Page 125.

68. Mr. Shank has been diagnosed with and suffers from CHC. Ms. Shank's treating physician, Dr. Davendra Ramkumar, prescribed Harvoni as the appropriate treatment and cure for Mr. Shank's CHC. Dr. Ramkumar is a gastroenterologist at the Christie Clinic in Champaign, Illinois and a Clinical Associate Professor at the University of Illinois College of Medicine.

69. On October 13, 2015, Mr. Shank visited Dr. Ramkumar for an evaluation of his CHC and was asked to have bloodwork taken to measure his hepatic function and viral load and to determine his CHC genotype.

70. On October 28, 2015, Dr. Ramkumar reviewed the lab results and determined that Mr. Shank has genotype 1A and abnormal liver enzymes. Mr. Shank's FIBROSpect II Index was 35, which is consistent with METAVIR F0-F1. A FIBROSpect II Index of 42-100 is consistent with METAVIR F2-F4. Dr. Ramkumar determined that Mr. Shank "appear[ed] to be a good candidate for treatment with Harvoni" and "request[ed] permission to treat him from his insurance." Exhibit C.

71. Prime, as the PBM under the HCSC Policies, requires a treating physician to submit a prior authorization form detailing a patient's METAVIR Score before providing

coverage for treatment with Harvoni.  *See* Exhibit D.  Dr. Ramkumar submitted this form to one or more Defendants.

72.     On December 7, 2015, Mr. Shank received a letter from BCBSIL stating that Prime had reviewed the request from Dr. Ramkumar and denying Harvoni coverage because, *inter alia*, Mr. Shank did not have a "METAVIR score greater than or equal to 2."  Exhibit E.  According to the letter, "[c]riteria used in making th[e] decision may include Milliman USA Care Guidelines, HCSC Medical Policy, Blue Cross Blue Shield Policy Association Reference Manual, and/or a health care professional's recommendation."  *Id.*

73.     On January 14, 2016, Dr. Ramkumar appealed Defendants' denial of coverage and again requested treatment with Harvoni for Mr. Shank.  *See* Exhibit F.  Dr. Ramkumar provided the following support for his request: "since the advent of the new oral antiviral agents, and given the recommendations of the American Association for the Study of Liver Diseases (AASLD) that ***all*** patients with hepatitis C be considered for treatment, I have recommended that he be treated . . . he has abnormal liver enzymes and has a borderline fibrosis score, both markers for patients who will likely benefit from treatment."  *Id.* (emphasis added).

74.     Defendants denied Mr. Shank and Dr. Ramkumar's appeal and request for coverage for Harvoni treatment.  *See* Exhibit E.

75.     Thus, applying the Coverage Guidelines—rather than the terms of the Shank Policy—Defendants arbitrarily determined that Mr. Shank had not shown severe enough liver fibrosis to be treated with Harvoni and cured of CHC.  *Compare* Exhibit B (Coverage Guidelines) *with* Exhibit E (denying coverage).

76.     After Defendants denied Mr. Shank's appeal for Harvoni treatment, Mr. Shank requested another DAA—Viekira Pak—to treat his CHC.  Defendants denied that request,

stating "Harvoni is the preferred medication for genotype 1, 4, and 6 and is subject to Prior Authorization."  Exhibit G.

77.    As a result of Defendants' wrongful refusal to fill Mr. Shank's Harvoni prescription, Mr. Shank has been wrongfully deprived of treatment for his CHC.

78.    Defendants' arbitrary requirement for CHC sufferers to experience advanced fibrosis, indicated by a METAVIR Score of F2 or higher, or its equivalent, before providing coverage for Harvoni treatment violates Plaintiff's and Class members' right to receive Medically Necessary treatment under the terms of the HCSC Policies, and places artificial restrictions on treatment that are not agreed upon or disclosed in the HCSC Policies and are not in accordance with the standard of care for the treatment of CHC in the medical community.

79.    Defendants' pattern and practice of denying Harvoni coverage for patients without a METAVIR Score of F2 or higher, or its equivalent, without including that requirement in the HCSC Policies, is in breach of their contractual obligations, creates a likelihood of misunderstanding and confusion for Plaintiff and Class members in violation of the UDTPA, and constitutes an unfair act or practice and/or a "deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" in violation of the CFA.  *See* 815 ILCS 505/2; *see also supra*, ¶6 (discussing NYAG subpoenas).

## V.    CLASS ACTION ALLEGATIONS

80.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

> All persons suffering from chronic Hepatitis C who are or were insured by HCSC or its divisions, affiliates, subsidiaries, agents or related entities, and were (1) prescribed Harvoni by their treating physician; and (2) denied coverage for Harvoni because they did not have a METAVIR Score of F2 or higher, or its equivalent, by one or more Defendants or their divisions, affiliates, subsidiaries, agents or related entities (the "Class").

23

81.     Excluded from the proposed Class are Defendants and their divisions, affiliates, subsidiaries, agents or related entities, directors, officers and/or employees.  Any judicial officer assigned to this action is also excluded.  Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information.

82.     This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(1), 23(b)(2) and/or 23(b)(3).

83.     The Class is so numerous that joinder of all members is impracticable.  Plaintiff believes that there are at thousands of proposed Class members throughout the United States.

84.     Common questions of law and fact exist as to all Class members and predominate over any issues solely affecting individual members of the Class.  The common questions of law and fact include but are not limited to:

- whether any Defendant was contractually obligated to provide Plaintiff and Class members with coverage for Medically Necessary treatment while the HCSC Policies were in force;

- whether the treatment of CHC with Harvoni is Medically Necessary under the terms of the HCSC Policies;

- whether Harvoni is a Covered Drug and/or Covered Service under the terms of the HCSC Policies;

- whether Harvoni is the standard of care for treating CHC;

- whether any Defendant breached their implied and/or express obligations under the HCSC Policies by denying Plaintiff and Class members coverage for Harvoni while the HCSC Policies were in force;

- whether HCSC and/or BCBSIL violated the Illinois Uniform Deceptive Trade Practices Act and/or Consumer Fraud Act by denying Plaintiff and Class members coverage for Harvoni; and

- whether Plaintiff and Class members are entitled to injunctive relief, specific performance and/or actual damages for Defendants' violations of contractual and/or statutory obligations.

24

85.     Plaintiff's claims are typical of the claims of the Class.   As alleged herein, Plaintiff and Class members sustained damages arising out of the same course of unlawful conduct by Defendants.

86.     Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to, or which conflict with, the interests of the members.

87.     Plaintiff's interests are co-extensive with, and not antagonistic to, those of the absent Class members.  Plaintiff will undertake to represent and protect the interests of the absent Class members.

88.     Plaintiff has engaged the services of the undersigned counsel.   Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and the absent Class members.

89.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.   Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

90.     Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

91.     The Class may also be certified under Rule 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which

would establish incompatible standards of conduct for Defendants, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

92.     The Class may also be certified under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief, including specific performance, with respect to the Class as a whole.

93.     The interest of Class members in individually controlling the prosecution of separate actions is theoretical and not practical.  The Class has a high degree of similarity and is cohesive.  Plaintiff anticipates no difficulty in the management of this matter as a class action.

## VI.     CLAIMS

**COUNT I**
**Breach of Contract**
**(Against All Defendants)**

94.     Plaintiff and Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

95.     Plaintiff and Class members entered into the HCSC Policies with one or more Defendants, through which Plaintiff and Class members agreed to pay monthly premiums to one or more Defendants in exchange for Defendants' agreement to provide health insurance coverage and prescription drug coverage to Plaintiff and Class members.

96.     Plaintiff and Class members performed their contractual obligations by paying monthly premiums to one or more Defendants.

97.     An implied covenant of good faith and fair dealing is included in every contract, including the HCSC Policies.

98. By entering into a contractual relationship with Plaintiff and Class members, Defendants agreed to perform their obligations under the HCSC Policies in good faith and to deal fairly and not unreasonably deny health insurance and/or prescription drug coverage to Plaintiff and Class members.

99. Defendants have a duty of good faith and fair dealing in their performance of the HCSC Policies. The implied covenant requires that Defendants exercise good faith towards Plaintiff and Class members when making coverage decisions and/or administering the HCSC Policies and requires Defendants comply with the spirit, not just the letter of the contracts.

100. Defendants materially breached both the explicit terms of Plaintiff's and Class members' HCSC Policies and the implied covenant of good faith and fair dealing inherent in the HCSC Policies by, *inter alia*:

(a) unreasonably denying coverage for Plaintiff's and Class members' claims for Harvoni treatment;

(b) failing to apply the appropriate standard for coverage when evaluating Plaintiff's and Class members' claims for coverage of Harvoni treatment, including the criteria for Medically Necessary required by the HCSC Policies;

(c) failing to find that treatment with Harvoni is a Covered Drug and/or Covered Service under Plaintiff's and Class members' HCSC Policies;

(d) arbitrarily applying the Coverage Guidelines to deny coverage for CHC sufferers without a METAVIR Score of F2 or higher, or its equivalent;

(e) denying coverage to Plaintiff and Class members for Harvoni treatment that is covered by the HCSC Policies;

(f) unreasonably failing to give due consideration to Plaintiff's and Class members' health and welfare when considering claims for coverage of Harvoni treatment;

(g) denying coverage to Plaintiff and Class members for Harvoni treatment in bad faith based on Defendants' desire to decrease costs and increase profits; and

(h)    requiring that Plaintiff's and Class members' health and medical condition deteriorate to F2 or higher stage liver fibrosis, resulting in irreversible damage and irreparable harm, before providing treatment with Harvoni that is Medically Necessary under the HCSC Policies.

101.    On information and belief, Defendants have breached the implied and/or express terms and provisions of materially identical HCSC Policies sold to Plaintiff and Class members by applying the Coverage Guidelines to unlawfully deny coverage for Harvoni, and other presently unknown acts and omissions, which will be proven at trial.

102.    Defendants have further breached the spirit of the HCSC Policies and their duty of good faith and fair dealing.

103.    As a direct and proximate result of Defendants' material breaches of their implied and express contractual obligations, Plaintiff and Class members have been wrongfully denied Harvoni coverage, have not received the benefit of their bargain, and have suffered and continue to suffer damages, including the retail cost of Harvoni treatment and other damages to be proven at trial.

104.    Alternatively, Plaintiff and Class members are entitled to specific performance of Defendants' obligations under the HCSC Policies to provide Harvoni coverage because further delay will cause irreversible and irreparable harm to the health of Plaintiff and Class members, for which monetary damages will not be an adequate remedy.

## <u>COUNT II</u>
### Violation of Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*
### (Against Defendants HCSC and BCBSIL)

105.    Plaintiff and Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

106.    HCSC and BCBSIL are persons under the UDTPA.  *See* 815 ILCS 510/1.

107.    Plaintiff and Class members are persons "likely to be damaged by a deceptive trade practice of another."  815 ILCS 510/3.

108.    HCSC and BCBSIL engaged in a "deceptive trade practice" in the course of "business, vocation, or occupation" by "engag[ing] in any [] conduct which similarly creates a likelihood of confusion or of misunderstanding."  815 ILCS 510/2.

109.    Plaintiff and Class members entered into valid health insurance contracts with one or more Defendants, and paid premiums which entitled them to payment for Medically Necessary Covered Drugs and/or Covered Services including treatment with Harvoni.

110.    HCSC and BCBSIL denied coverage for Harvoni as a way to artificially limit the number of CHC sufferers who would be given access to Harvoni in order to decrease costs and increase profits at the expense of Plaintiff and the Class.

111.    Despite the clear terms of Plaintiff's and Class members' contracts (which do not arbitrarily restrict access to Harvoni), HCSC and BCBSIL require Plaintiff and Class members to deteriorate to F2 or higher stage liver fibrosis before providing Harvoni treatment coverage—an irreparable harm.

112.    HCSC and BCBSIL's conduct of arbitrarily denying Harvoni treatment coverage to CHC sufferers without F2 or higher stage liver fibrosis, including Plaintiff and Class members, creates a likelihood of confusion or misunderstanding in violation of the UDTPA given the representations made in the HCSC Policies that Defendants will provide health insurance and prescription drug coverage for Medically Necessary treatment.  *See* 815 ILCS 510/2.

113.    HCSC and BCBSIL's pattern and practice of denying Harvoni coverage based on undisclosed Coverage Guidelines—not a part of the HCSC Policies—creates a likelihood of confusion or misunderstanding in violation of the UDTPA.  *See* 815 ILCS 510/2.

114.    Plaintiff and Class members are "likely to be damaged by" HCSC and BCBSIL's "deceptive trade practice" as they are forced to continue to suffer from CHC without Harvoni—a treatment that can cure their chronic illness.  815 ILCS 510/3.  As a proximate result of HCSC and BCBSIL's deceptive trade practice, including requiring that CHC patients suffer advanced fibrosis evidenced by a METAVIR Score of F2 or higher, Plaintiff and Class members will suffer irreversible and irreparable harm to their medical condition and health.

115.    Because Plaintiff and Class members will suffer irreparable harm as a result of HCSC and BCBSIL's deceptive trade practice, Plaintiff and Class members are entitled to actual damages in the amount of the retail cost of Harvoni treatment and damages to be determined at trial and/or injunctive relief requiring HCSC and BCBSIL to abide by their contractual obligations in the HCSC Policies to provide coverage for Harvoni treatment for Plaintiff and Class members.  *See* 815 ILCS 510/3; 815 ILCS 505/2; 815 ILCS 505/10a(a) and (c).

116.    Plaintiff and Class members are also entitled to all costs of litigation and attorney's fees because, *inter alia*, HCSC and BCBSIL have "willfully" engaged in the deceptive trade practice alleged herein.  *See* 815 ILCS 510/3; 815 ILCS 505/10a(a) and (c).

<u>**COUNT III**</u>
**Violation of Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq.***
**(Against Defendants HCSC and BCBSIL)**

117.    Plaintiff and Class members incorporate and re-allege each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

118. Plaintiff and Class members have suffered actual damages as a result of HCSC and BCBSIL's violations of the Illinois Consumer Fraud Act, 815 ILCS 505/1 *et seq*., and may bring a civil action. *See* 815 ILCS 505/10a.

119. Plaintiff and Class members are persons and consumers under the CFA. *See* 815 ILCS 505/1.

120. HCSC and BCBSIL are persons under the CFA. *See* 815 ILCS 505/1.

121. HCSC and BCBSIL marketed and sold the HCSC Policies with the intent that Plaintiff and Class members would rely on HCSC and BCBSIL to provide health insurance and prescription drug coverage. Plaintiff and Class members reasonably relied on HCSC and BCBSIL to provide health insurance and prescription drug coverage—pursuant to the terms of the HCSC Policies—in exchange for the monthly premiums paid by Plaintiff and Class members to HCSC or BCBSIL.

122. HCSC and BCBSIL's use of the Coverage Guidelines—rather than any contractual provision in the HCSC Policies—to deny Harvoni coverage to CHC sufferers without a METAVIR Score of F2 or higher, including Plaintiff and Class members, constitutes a unfair act or practice in violation of the CFA because it offends public policy, is immoral, unethical, oppressive, or unscrupulous and/or causes substantial injury to consumers. 815 ILCS 505/2.

123. HCSC and BCBSIL's use of the Coverage Guidelines—rather than any contractual provision in the HCSC Policies—to deny Harvoni coverage to CHC sufferers without a METAVIR Score of F2 or higher, including Plaintiff and Class members, constitutes a "deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" in the conduct of trade or commerce in violation of the CFA. 815 ILCS 505/2.

124.    HCSC and BCBSIL employed a "deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact" with the intent that Plaintiff and Class members would rely thereon in connection with their sale of the HCSC Policies and their provision of health insurance and prescription drug coverage services in violation of the CFA.  815 ILCS 505/2.

125.    As a direct and proximate result of HCSC and BCBSIL's wrongful denial of Harvoni coverage in violation of the CFA, Plaintiff and Class members have suffered and continue to suffer irreparable harm in the form of irreversible deterioration of their medical condition and health, and actual damages in the amount of the retail cost of Harvoni treatment and damages to be determined at trial.

126.    As a result of HCSC and BCBSIL's wrongful denial of Harvoni coverage in violation of the CFA, Plaintiff and Class members are entitled to damages, costs of litigation, attorneys' fees, and other equitable relief.  *See* 815 ILCS 505/10a(a) and (c).

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class, and award the following relief:

A.    that this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Class and Plaintiff's counsel as counsel for the Class;

B.    award Plaintiff and Class members appropriate relief, including, *inter alia*, actual damages sustained by Plaintiff and the Class as the result of Defendants' material breach of the terms of the HCSC Policies;

C.    order equitable, injunctive, and declaratory relief as may be appropriate, including specific performance of Defendants' contractual obligation under the HCSC Policies to provide coverage to Plaintiff and Class members for the Medically Necessary Harvoni treatment;

      D.      award all costs of prosecuting the litigation, including expert fees and attorneys' fees under 815 ILCS 505/10a(a) and (c); 815 ILCS 510/3; and other applicable laws;

      E.      award pre- and post-judgment interest; and

      F.      grant such additional relief as this Court may deem just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: April 4, 2016               Respectfully submitted,

**LAW OFFICE OF NORMAN RIFKIND**

/s/ Norman Rifkind_____
100 E Huron Street #1306
Chicago, IL 60611
Telephone: (847) 372-4747
Norman@RIFSLAW.com

*Local and Liaison Counsel for Plaintiff*

**KESSLER TOPAZ
 MELTZER & CHECK, LLP**
Joseph H. Meltzer (PA Bar No. 80136)*
jmeltzer@ktmc.com
Edward W. Ciolko (NJ Bar No. 005462002)*
eciolko@ktmc.com
Natalie Lesser (PA Bar No. 309334)*
nlesser@ktmc.com
Zachary Arbitman (PA Bar No. 314274)*
zarbitman@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**COOPER & KIRK, PLLC**
David H. Thompson (D.C. Bar No. 450503)*
dthompson@cooperkirk.com
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601

*Attorneys for Plaintiff Mark A. Shank and the Proposed Class*

*\*Pro hac vice forthcoming*